SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Charles Kratovil v. City of New Brunswick** (A-6-24) (089427)

**Argued March 3, 2025 -- Decided June 17, 2025**

**PATTERSON, J., writing for a unanimous Court.**

In this appeal, the Court reviews a journalist's as-applied challenge to Daniel's Law, L. 2020, c. 125.

In 2023, plaintiff Charles Kratovil learned through a records request pursuant to the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, that the voting address of defendant Anthony Caputo, the New Brunswick Police Director, was in the Borough of Cape May.  Kratovil, the editor of news outlet New Brunswick Today, began working on a story about Caputo's residence, suggesting that Caputo lived too far from New Brunswick to effectively discharge his public duties.  After Kratovil disclosed Caputo's address to local officials, Caputo notified Kratovil that he was a covered person under Daniel's Law, N.J.S.A. 56:8-166.1; N.J.S.A. 2C:20-31.1, and requested that Kratovil refrain from republishing his exact home address.

Kratovil filed this action, seeking declaratory and injunctive relief and asserting that Daniel's Law as applied to him violates the New Jersey Constitution's guarantees of freedom of speech and freedom of the press.  The trial court rejected Kratovil's as-applied challenge to Daniel's Law and dismissed his complaint, concluding that Kratovil had the right to publish that Caputo lived in Cape May but not to publish Caputo's precise home address.  The Appellate Division affirmed the trial court's judgment.  The Court granted certification.  258 N.J. 468 (2024).

**HELD:**  Applying First Amendment principles stated in Smith v. Daily Mail Publishing Co., 443 U.S. 97, 98, 102-03 (1979), and Florida Star v. B.J.F., 491 U.S. 524, 530 (1989), the Court views Caputo's specific address to constitute truthful information, lawfully obtained, that addresses a matter of public concern.  As the parties agree and the trial court and Appellate Division determined, Daniel's Law serves a state interest of the highest order:  the protection of certain public officials and their immediate family members living in the same household so that those officials can perform their duties without fear of reprisal.  See N.J.S.A. 56:8-166.3. Daniel's Law, as applied to prevent Kratovil's proposed republication of Caputo's exact home address, is narrowly tailored to serve that state interest.

1.  The Senate Judiciary Committee identified Daniel's Law as "legislative action
directly related to, and intended to honor, Daniel Anderl, the son of a federal judge,
who was shot and killed in July 2020 at the judge's family home by a person who
had compiled a dossier of personal information about the judge, including the
judge's home address."  Daniel's Law applies to the home address and unpublished
home telephone number of a "covered person," defined as "an active, formerly
active, or retired judicial officer, law enforcement officer, or child protective
investigator in the Division of Child Protection and Permanency, . . . or prosecutor,
and any immediate family member residing in the same household" of such an
official.  N.J.S.A. 56:8-166.1(d).  (pp. 14-15)

2.  The provisions of Daniel's Law invoked in this case apply only if an "authorized
person" "provide[s] written notice to the person from whom the authorized person is
seeking nondisclosure."  Id. at (a)(2); N.J.S.A. 2C:20-31.1(c).  The notice must state
"that the authorized person is an authorized person" and must request "that the
person cease the disclosure of the information and remove the protected information
from the Internet or where otherwise made available."  N.J.S.A. 56:8-166.1(a)(2).
Daniel's Law imposes no obligation on a person in possession of the covered
person's home address or unpublished home telephone number who has not received
the notice that the statute requires, and the statute's restrictions on disclosure do not
go into effect until ten business days after the "person from whom the authorized
person is seeking nondisclosure" receives notice in the form prescribed.  Id. at
(a)(1); N.J.S.A. 2C:20-31.1(b).  Civil or, under certain circumstances, criminal
penalties may be imposed for a violation of Daniel's Law.  The Legislature
instructed that Daniel's Law "shall be liberally construed in order to accomplish its
purpose and the public policy of this State" -- the protection of certain public
officials and their immediate families from threats and harm that might impede their
ability to serve the public.  N.J.S.A. 56:8-166.3.  (pp. 15-19)

3.  Both the First Amendment to the United States Constitution and Article I,
Paragraph 6 of the New Jersey Constitution guarantee a broad affirmative right to
free speech.  In a series of decisions known as the Daily Mail line of cases, the
Supreme Court developed a three-part test to resolve "[t]he tension between the right
which the First Amendment accords to a free press, on the one hand, and the
protections which various statutes and common-law doctrines accord to personal
privacy against the publication of truthful information, on the other."  Fla. Star, 491
U.S. at 530.  The Court reviews that line of cases, in each of which the Supreme
Court emphasized that it was "resolving this conflict only as it arose in a discrete
factual context."  Ibid.  (pp. 19-29)

4.  The Court applies the principles stated in the Daily Mail line of cases to
Kratovil's as-applied challenge to Daniel's Law.  The Court's first inquiry is
therefore whether Caputo's home address is (1) truthful information that was (2)

2

lawfully obtained and is (3) of public significance.  Id. at 536.  Caputo maintains that he rented other residences near his workplace and stayed there on weekdays, as well as on weekends when his duties required, but he does not dispute that the Cape May address that Kratovil obtained from the voter profile is the correct address of his home in that municipality.  There is, accordingly, no dispute that the information at issue is truthful.  And Kratovil lawfully obtained Caputo's home address from the records custodian of the Cape May Board of Elections in response to an OPRA request:  there is no indication in the record that Kratovil violated any law in his communications with the custodian.  Last, in regard to whether this case involves a matter of public concern, the Court modifies the Appellate Division's decision and holds that, in the specific circumstances of this case, Caputo's home address in Cape May relates to a matter of public concern.  The Court explains that, in Florida Star, the United States Supreme Court did not frame the question to be whether the crime victim's name was itself a matter of public concern, but whether the subject of the news article was a matter of public concern.  Id. at 537.  Here, the contested information -- Caputo's exact home address in Cape May -- is related to Kratovil's proposed story, and the subject matter of the story -- a public official's alleged failure to perform his duties because he lived hours from the community he served -- is clearly a matter of public concern.  (pp. 29-32)

5.  The second inquiry in the test prescribed in Daily Mail and Florida Star is whether the challenged law "serves 'a need to further a state interest of the highest order.'"  Id. at 537 (quoting Daily Mail, 443 U.S. at 103).  In this appeal, all parties agree that Daniel's Law serves a state interest of the highest order.  The trial court and Appellate Division found that Daniel's Law serves a state interest of the highest order.  The Court agrees, citing the Legislature's express purpose in enacting Daniel's Law, see N.J.S.A. 56:8-166.3, and decisions and amicus submissions that underscore the persistence and severity of the problem the Legislature enacted Daniel's Law to address.  (pp. 32-34)

6.  Finally, the Court determines whether Daniel's Law, as applied to Kratovil, is narrowly tailored to promote the state interest it was enacted to serve.  To narrowly tailor, the state must choose the least restrictive means among available, effective alternatives.  First, the statute does not purport to protect all public employees.  Instead, it is expressly limited to discrete categories of current and former public officials viewed by the Legislature to be at particular risk:  judges, law enforcement officers, child protective investigators in the Division of Child Protection and Permanency, and prosecutors.  See N.J.S.A. 56:8-166.1, -166.3; N.J.S.A. 2C:20-31.1.  Second, Daniel's Law implicates only two categories of information:  the covered person's home address and the covered person's unpublished home telephone number.  N.J.S.A. 56:8-166.1(a)(1); N.J.S.A. 2C:20-31.1.  Third, even if an individual falls within one of the discrete categories of "covered persons," the statute imposes no liability for publishing that individual's address or phone number

3

unless and until an authorized person expressly invokes the protection of Daniel's Law by providing the notice required by N.J.S.A. 56:8-166.1(a)(1) to (2) and N.J.S.A. 2C:20-31.1(b) to (c).  Fourth, Daniel's Law is not underinclusive and thus inadequate to serve the state interest, as were the statutes struck down by the United States Supreme Court in <u>Daily Mail</u>, 443 U.S. at 104-05 (in which the disputed statute failed to serve its purpose because it restricted only "newspapers," not electronic media or other forms of publication) and <u>Florida Star</u>, 491 U.S. at 540 (in which the statute at issue prohibited publication of the protected information only in an "instrument of mass communication," thus failing to achieve the state's goal of protecting crime victims).  Indeed, Daniel's Law is not focused on media in general, let alone a particular category of media.  As applied to Kratovil, Daniel's Law as written is narrowly tailored to achieve the state interest of the highest order: protection of certain public officials from harm and the threat of harm so that they can perform their public duties without fear of reprisal.  (pp. 34-39)

7.  Because Daniel's Law complies with the First Amendment principles of <u>Florida Star</u> and <u>Daily Mail</u>, it also conforms to the freedom of speech and press guarantees, set forth in Article I, Paragraph 6 of the New Jersey Constitution, that Kratovil invokes in this appeal.  Given the Court's conclusion that Kratovil's constitutional claim fails, he is also not entitled to relief under the New Jersey Civil Rights Act, and the trial court properly dismissed his complaint.  (pp. 39-40)

**AFFIRMED AS MODIFIED.**

**JUSTICES PIERRE-LOUIS, WAINER APTER, and NORIEGA, and JUDGE SABATINO (temporarily assigned) join in JUSTICE PATTERSON's opinion. CHIEF JUSTICE RABNER and JUSTICES FASCIALE and HOFFMAN did not participate.**

4

SUPREME COURT OF NEW JERSEY

A-6 September Term 2024

089427

---

Charles Kratovil,

Plaintiff-Appellant,

v.

City of New Brunswick and
Anthony A. Caputo, in his capacity as
Director of Police,

Defendants-Respondents.

---

On certification to the Superior Court,
Appellate Division.

---

| Argued | Decided |
|--------|---------|
| March 3, 2025 | June 17, 2025 |

---

Alexander Shalom argued the cause for appellant
(Lowenstein Sandler, and American Civil Liberties Union
of New Jersey Foundation, attorneys; Alexander Shalom,
Jeanne LoCicero, and Ezra Rosenberg, on the briefs).

Susan K. O'Connor argued the cause for respondents
(Hoagland, Longo, Moran, Dunst & Doukas, attorneys;
Susan K. O'Connor, of counsel and on the briefs, and
Christy L. Cushing, Jack M. Middough, Niki A. Waters,
Alexandrea Williams, and R. Leigh Adelman, on the
briefs).

Michael L. Zuckerman, Deputy Solicitor General, argued
the cause for amicus curiae Attorney General of New
Jersey (Matthew J. Platkin, Attorney General, attorney;

1

Jeremy M. Feigenbaum, Solicitor General, and Michael L. Zuckerman, of counsel and on the brief, and Joshua Bohn and Marie Cepeda Mekosh, Deputy Attorneys General, on the brief).

Frank L. Corrado argued the cause for amici curiae Reporters Committee for Freedom of the Press, New Jersey Press Association, Advance Publications, Inc., Gannett Co., Inc., and MediaNews Group, Inc. (Barry, Corrado & Grassi, attorneys; Frank L. Corrado, on the letter in lieu of a brief).

Arleigh P. Helfer, III, submitted a brief on behalf of amicus curiae Foundation for Individual Rights and Expression (Foundation for Individual Rights and Expression, attorneys; Arleigh P. Helfer, III, on the brief).

Joseph Paravecchia, First Assistant Hunterdon County Prosecutor, submitted a letter in lieu of a brief on behalf of amicus curiae County Prosecutors Association of New Jersey (Mark Musella, President, County Prosecutors Association of New Jersey, attorneys; Joseph Paravecchia, on the letter).

Robert R. Cannan submitted a brief on behalf of amicus curiae State Troopers Fraternal Association of New Jersey (Markman & Cannan, attorneys; Robert R. Cannan, of counsel and on the brief).

Paul L. Kleinbaum submitted a brief on behalf of amicus curiae New Jersey State Policemen's Benevolent Association (Zazzali, attorneys; Paul L. Kleinbaum, of counsel and on the brief, and Sheila Murugan, on the brief).

Matthew D. Areman submitted a brief on behalf of amicus curiae New Jersey State Lodge of the Fraternal Order of Police (Markowitz & Richman, attorneys;

2

Matthew D. Areman and Richard J. De Fortuna, on the brief).

Vito A. Gagliardi, Jr. submitted a brief on behalf of amicus curiae New Jersey State Association of Chiefs of Police (Porzio, Bromberg & Newman, attorneys; Vito A. Gagliardi, Jr., of counsel, and David L. Disler and Thomas J. Reilly, on the brief).

---

JUSTICE PATTERSON delivered the opinion of the Court.

---

The Legislature enacted Daniel's Law "to enhance the safety and security of certain public officials in the justice system," thereby enabling those officials to "carry out their official duties without fear of personal reprisal." N.J.S.A. 56:8-166.3. Subject to strict notice requirements, Daniel's Law prescribes a procedure by which the home address and unpublished home telephone number of a public official designated as a "covered person" can be protected from disclosure or redisclosure. N.J.S.A. 56:8-166.1; N.J.S.A. 2C:20-31.1. Daniel's Law imposes civil liability on persons, businesses, and associations that violate the statute, N.J.S.A. 56:8-166.1(b) to (c), and provides for criminal liability for reckless or intentional violations, N.J.S.A. 2C:20-31.1-1(b), (d).

In this appeal, we review a journalist's as-applied challenge to Daniel's Law. In 2023, plaintiff Charles Kratovil learned through a records request pursuant to the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13,

3

that the voting address of defendant Anthony Caputo, the New Brunswick

Police Director, was in the Borough of Cape May.  Kratovil began working on

a story about Caputo's residence.  After Kratovil disclosed Caputo's address to

local officials, Caputo notified Kratovil that he was a covered person under

Daniel's Law and requested that Kratovil refrain from republishing his exact

home address.

Kratovil filed this action, seeking declaratory and injunctive relief and

asserting that Daniel's Law as applied to him violates the New Jersey

Constitution's guarantees of freedom of speech and freedom of the press.  The

trial court rejected Kratovil's as-applied challenge to Daniel's Law and

dismissed his complaint.  The court concluded that Kratovil had the right to

publish that Caputo lived in Cape May but not to publish Caputo's precise

home address.  It also held that Daniel's Law was narrowly tailored to achieve

a state interest of the highest order.

The Appellate Division affirmed the trial court's judgment.  The

appellate court held that as applied to Kratovil, Daniel's Law does not violate

constitutional guarantees of freedom of speech and freedom of the press.  It

concurred with the trial court that the statute supports a state interest of the

highest order and that it is narrowly tailored to serve that state interest, given

that Kratovil was free to state in his article that Caputo lived in Cape May

4

without disclosing his exact address.  The appellate court accordingly rejected Kratovil's application for injunctive and other relief.  We granted Kratovil's petition for certification.

Applying First Amendment principles stated by the United States Supreme Court in <u>Smith v. Daily Mail Publishing Co.</u>, 443 U.S. 97, 98, 102-03 (1979), and <u>Florida Star v. B.J.F.</u>, 491 U.S. 524, 530 (1989), we view Caputo's specific address to constitute truthful information, lawfully obtained, that addresses a matter of public concern.  As the parties agree and the trial court and Appellate Division determined, Daniel's Law serves a state interest of the highest order:  the protection of certain public officials and their immediate family members living in the same household so that those officials can perform their duties without fear of reprisal.  <u>See</u> N.J.S.A. 56:8-166.3.  We consider Daniel's Law, as applied to prevent Kratovil's proposed republication of Caputo's exact home address, to be narrowly tailored to serve that state interest.

Accordingly, we affirm as modified the Appellate Division's judgment.

## I.

### A.

We summarize the facts based on the allegations of Kratovil's complaint, the record presented to the trial court, and the parties' briefs.

5

When this matter arose in 2023, Caputo, a retired police officer, served as New Brunswick's full-time Director of Police and was also a member of the New Brunswick Parking Authority's Board of Commissioners.  The record does not reveal when he was appointed, but it indicates that he retired as Director of Police in 2024.

Kratovil is the editor of New Brunswick Today, an independent news outlet covering local issues in the City of New Brunswick.  After receiving information indicating that Caputo lived in Cape May, a two-hour drive from New Brunswick, Kratovil served an OPRA request seeking Caputo's voter profile on the records custodian for the Cape May County Board of Elections.

Citing Caputo's reasonable expectation of privacy with respect to his home address, the records custodian provided a copy of the voter profile with Caputo's home address redacted.  In response to Kratovil's March 14, 2023 e-mail inquiry to Caputo as to whether he still lived in New Brunswick, a New Brunswick Police Department official responded on Caputo's behalf that "[t]he public release of a law enforcement officer's place of residence is protected under Daniel's Law."  Kratovil states that on March 22, 2023, he shared with the members of the New Brunswick Parking Authority Board of Commissioners the redacted voter profile, which showed that Caputo had registered to vote in Cape May County.  Kratovil also asserts that at the New

Brunswick City Council's April 5, 2023 public meeting, he inquired as to whether Caputo lived in New Brunswick but did not receive a response.

Kratovil represents that he then advised the Board of Elections records custodian by e-mail that Caputo had no reasonable expectation of privacy in his home address under current case law.  He asserts that on April 17, 2023, the records custodian produced a second version of Caputo's voter profile that revealed Caputo's home address.  Defendants maintain that the records custodian's decision to redact the address from the voter profile that was initially disclosed was a correct application of the relevant OPRA provision, N.J.S.A. 47:1B-3, and that the custodian's production of the unredacted voter profile was an error.

According to Kratovil, on May 3, 2023, he attended another meeting of the New Brunswick City Council.  He stated that he spoke during the public portion of the meeting, identifying the street but not the house number that appeared in Caputo's voter profile.  Kratovil recounts that at that meeting, he provided Council members with copies of the unredacted version of the voter profile that disclosed Caputo's address.

Kratovil alleges that on May 15, 2023, he received by certified and regular mail a letter from Caputo, dated May 4, 2023, and captioned "NOTICE pursuant to N.J.S.A. 2C:20-31.1 & N.J.S.A. 56:8-166.1."  The letter stated:

On Wednesday, May 3, 2023, you published and/or announced my home address at a public meeting of the New Brunswick City Council. Kindly accept this letter a written notice as required by the above referenced statute.

Pursuant to N.J.S.A. 2C:20-31.1 and N.J.S.A. 56:8-166.1, and as an authorized and otherwise covered person whose home address and unpublished home telephone number are not subject to disclosure, I do hereby request that you cease the disclosure of such information and remove the protected information from the internet or where otherwise made available.

I trust you will be guided accordingly.

The letter indicated that copies had been sent to Middlesex County's First Assistant Prosecutor and New Brunswick's City Attorney.

According to Kratovil, the notice he received pursuant to Daniel's Law gave him "reasonable grounds to fear that he would be a target for an enforcement action that would seek to criminalize his investigative journalism work." Nonetheless, no civil action has been filed against Kratovil pursuant to N.J.S.A. 56:8-166.1(b) and (c), and no criminal proceedings have been instituted against him under N.J.S.A. 2C:20-31.1. Defendants represent that they have taken no action of any kind against Kratovil related to his disclosure of Caputo's address.

B.

1.

Kratovil filed a verified complaint and order to show cause.  He alleged that he was preparing a story about the location of Caputo's residence, which is a matter of public concern.  Characterizing Caputo's Daniel's Law notice dated May 4, 2023 as a "cease-and-desist" letter and a prior restraint, Kratovil alleged that two provisions of the statute, N.J.S.A. 2C:20-31.1 and N.J.S.A. 56:8-166.1, are unconstitutional as applied to him under the freedom of speech and press guarantees of Article I, Paragraph 6 of the New Jersey Constitution. Kratovil sought a declaratory judgment pursuant to the Uniform Declaratory Judgments Law, N.J.S.A. 2A:16-50 to -62, that Daniel's Law is unconstitutional as applied.  He also sought preliminary and permanent injunctions barring the imposition of criminal or civil penalties against him for publishing Caputo's full home address, as well as attorneys' fees and costs pursuant to the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2.[1]

Defendants countered that Caputo's May 4, 2023 letter was not a cease-and-desist letter, but rather the notification prescribed in Daniel's Law; that

---

[1] Kratovil served notice pursuant to Rule 4:28-4 on the Attorney General that he challenged the constitutionality of Daniel's Law.  Noting that this is a fact-specific as-applied challenge, not a facial challenge, the Attorney General's Office advised the trial court that it declined to participate as an intervenor.

the disclosure of the address would put Caputo and his family at risk; and that Kratovil was free to exercise his First Amendment rights by identifying the name of the municipality in which Caputo lives in his story about Caputo's residence.

The trial court granted amicus curiae status to the County Prosecutors Association of New Jersey (CPANJ), the State Troopers Fraternal Association of New Jersey (STFA), the New Jersey State Policemen's Benevolent Association (NJSPBA), the New Jersey State Lodge of the Fraternal Order of Police (FOP), and the New Jersey State Association of Chiefs of Police (NJSACP).

The trial court ruled that Kratovil is a journalist and that he lawfully obtained Caputo's home address. It concluded, however, that the matter of public significance in this case is the fact that Caputo "resides in Cape May" and was allegedly "an absentee non-resident official employed by the City of New Brunswick." The trial court reasoned that Caputo's exact street address was "logically immaterial to this particular story." The court found the protection of public officials to be a state interest of the highest order and viewed Daniel's Law to be "as narrowly tailored as possible to achieve its purpose by way of the least restrictive means."

10

Accordingly, the trial court denied Kratovil's application for injunctive relief and dismissed his complaint.

2.

Kratovil appealed the trial court's judgment. The Appellate Division granted Kratovil's application to accelerate the appeal. The appellate court maintained the amicus curiae status of the organizations that had appeared before the trial court and granted amicus curiae status to the Reporters Committee for Freedom of the Press (RCFP).

The Appellate Division affirmed the trial court's judgment. It concurred with the trial court that Caputo's residence in Cape May was a matter of public concern, but that his precise street address was not. The appellate court concluded that no prior restraint was imposed on Kratovil because the sole notice was sent by Caputo, who did not enjoin Kratovil from publishing his address, and any penalties under Daniel's Law could be imposed only by a court. The Appellate Division found that the trial court's decision did not have a chilling effect on Kratovil's journalism or infringe on his editorial discretion because the court did not tell him "what he could or could not publish." The appellate court did not address whether Daniel's Law is narrowly tailored to serve a state interest of the highest order.

11

3.

We granted Kratovil's petition for certification.  258 N.J. 468 (2024).

We maintained the amicus curiae status of the organizations named above and

also granted amicus curiae status to the Attorney General and the Foundation

for Individual Rights and Expression (FIRE).

II.

Kratovil contends that under United States Supreme Court jurisprudence,

if a person lawfully obtains truthful information on a matter of public concern,

state officials may not constitutionally punish publication of that information

unless they show that the restriction is necessary to further a state interest of

the highest order.  He asserts that Caputo's home address involves a matter of

public concern because it relates to the allegation that Caputo is an absentee

public official, which is a matter of public concern.  Kratovil concedes that

Daniel's Law furthers a state interest of the highest order but claims that the

statute is not narrowly tailored to serve that state interest and that the

Appellate Division did not consider methods by which Daniel's Law could be

tailored more narrowly.

Defendants argue that Caputo's precise home address does not constitute

a matter of public concern under the United States Supreme Court's case law.

They note that the Supreme Court has long recognized public employees'

12

significant privacy interest in their home addresses.  Defendants argue that Daniel's Law serves a state interest of the highest order -- the protection of public servants and their families -- and is narrowly tailored to serve that interest because it clearly identifies "who and what it covers," and it is an "opt-in" statute requiring public officials to take specific steps to assert their rights.

The Attorney General explains that no facial attack on Daniel's Law could prevail because the majority of the statute's applications relate to data brokers and implicate only private concerns, thus warranting reduced First Amendment protection.  With respect to Kratovil's as-applied challenge, the Attorney General concurs with the Appellate Division's balancing of the competing interests at issue.

RCFP asserts that Daniel's Law, as applied to this case, stifles public-interest journalism and infringes on constitutionally protected editorial discretion.  FIRE argues that the burden of protecting private information is on the government and that, because Kratovil obtained Caputo's address lawfully, it must be presumed that the disclosure of that address serves the public interest.

CPANJ contends that Daniel's Law serves a state interest of the highest order, the protection of prosecutors and other covered persons who may be

13

targeted by violent offenders. STFA states that the exact addresses of Caputo

and other persons covered by Daniel's Law are not a matter of public concern.

NJSPBA argues that Daniel's Law provides the least restrictive means of

serving a state interest of the highest order, protecting public officials from

violent attacks and harassment. FOP agrees with defendants that Caputo's

specific home address is purely a matter of private concern. NJSACP asserts

that the Appellate Division reached a sensible, practical decision that adheres

to United States Supreme Court precedent.

## III.

### A.

We review de novo the trial court's determination that Daniel's Law is

constitutional as applied in this case. <u>State v. Hill</u>, 256 N.J. 266, 280 (2024).

We owe no deference to the conclusions of law reached by the trial court or

the Appellate Division. <u>Ibid.</u>

### B.

The Legislature enacted Daniel's Law on November 20, 2020. <u>L.</u> 2020,

<u>c.</u> 125 (codified at N.J.S.A. 2C:20-31.1; N.J.S.A. 47:1-17, :1A-1.1, :1A-5, and

:1B-1 to -3; and N.J.S.A. 56:8-166.1 to -166.3). The statute represents

"legislative action directly related to, and intended to honor, Daniel Anderl,

the son of a federal judge, who was shot and killed in July 2020 at the judge's

family home by a person who had compiled a dossier of personal information about the judge, including the judge's home address." S. Judiciary Comm. Statement to A. 1649 (Oct. 22, 2020).

Daniel's Law applies to the home address and unpublished home telephone number of a "covered person," defined as "an active, formerly active, or retired judicial officer, law enforcement officer, or child protective investigator in the Division of Child Protection and Permanency, . . . or prosecutor, and any immediate family member residing in the same household" of such an official. N.J.S.A. 56:8-166.1(d).

The provisions of Daniel's Law invoked in this case apply only if an "authorized person" takes specific steps to prevent the disclosure of a covered person's home address or unpublished home telephone number. Id. at (a). An "authorized person" is defined as

> a covered person or any of the following persons hereby authorized to submit or revoke a request for the redaction or nondisclosure of a home address on behalf of a covered person:
>
> > (1) on behalf of any federal judge, a designee of the United States Marshals Service or of the clerk of any United States District Court;
> >
> > (2) on behalf of any covered person who is deceased or medically or psychologically incapacitated, a person acting on behalf of the covered person as a designated trustee, as an

15

estate executor, or pursuant to a written power of attorney or other legal instrument; and

(3) on behalf of any immediate family member who is a minor and who is otherwise entitled to address redaction or nondisclosure pursuant to this act, the parent or legal guardian thereof.

[Id. at (d).]

An "authorized person" who seeks "to prohibit the disclosure of the home address or unpublished home telephone number of any covered person" shall "provide written notice to the person from whom the authorized person is seeking nondisclosure."[2] Id. at (a)(2); N.J.S.A. 2C:20-31.1(c).  The notice must state "that the authorized person is an authorized person" and must request "that the person cease the disclosure of the information and remove the protected information from the Internet or where otherwise made available." N.J.S.A. 56:8-166.1(a)(2).

---

[2]  Under the plain language of Daniel's Law, the term "address" in N.J.S.A. 56:8-166.1 and N.J.S.A. 2C:20-31.1 denotes the covered person's exact street address that would serve as a mailing address, not simply the name of the municipality in which that person lives.  See Black's Law Dictionary 47 (12th ed. 2024) (defining "address" as "[t]he place where mail or other communication is sent"); Webster's II New College Dictionary 13 (1995) (defining "address" to mean "[t]he indication of destination, as on mail or parcels" and "[t]he location at which a person or an organization may be reached"); Merriam-Webster's Collegiate Dictionary 15 (11th ed. 2003) (defining "address" as "a place where a person or organization may be communicated with," "directions for delivery on the outside of an object (as a letter or package)," and "the designation of place of delivery placed between the heading and salutation on a business letter").

16

Daniel's Law imposes no obligation on a person in possession of the covered person's home address or unpublished home telephone number who has not received the notice that the statute requires.  N.J.S.A. 56:8-166.1(a) to (b); N.J.S.A. 2C:20-31.1(b) to (c).  As N.J.S.A. 56:8-166.1(a)(1) and N.J.S.A. 2C:20-31.1(b) plainly state, the statute's restrictions on disclosure of a covered person's home address and unpublished home telephone number do not go into effect until ten business days after the "person from whom the authorized person is seeking nondisclosure" receives notice in the form prescribed.  Ibid.

Effective "not later than ten business days following receipt" of the statutory notice, "a person, business, or association shall not disclose or re-disclose on the Internet or otherwise make available, the home address or unpublished home telephone number of any covered person."  N.J.S.A. 56:8-166.1(a)(1).

"A person, business, or association that violates" N.J.S.A. 56:8-166.1(a) "shall be liable to the covered person or the covered person's assignee, who may bring a civil action in the Superior Court."  Id. at (b).  The statute provides that the court shall award:

> (1) actual damages, but not less than liquidated damages computed at the rate of $1,000 for each violation of this act;
>
> (2) punitive damages upon proof of willful or reckless disregard of the law;

17

(3) reasonable attorneys' fees . . . ; and

(4) any other preliminary and equitable relief as the court determines to be appropriate.

[Id. at (c).]

Daniel's Law imposes criminal penalties in certain circumstances. N.J.S.A. 2C:20-31.1. "[N]ot later than ten business days after receipt" of notice in accordance with N.J.S.A. 2C:20-31.1(c),

a person shall not knowingly, with purpose to expose another to harassment or risk of harm to life or property, or in reckless disregard of the probability of such exposure, post, repost, publish, or republish on the Internet, or otherwise make available, the home address or unpublished home telephone number of any covered person, except in compliance with any court order, law enforcement investigation, or request by a government agency or person duly acting on behalf of the agency.

[Id. at (b).]

A "reckless violation" of that provision is a fourth-degree crime, and a "purposeful violation" is a third-degree crime.  Id. at (d).[3]

---

[3]  The Legislature adopted several exceptions to Daniel's Law.  See N.J.S.A. 56:8-166.1; N.J.S.A. 2C:20-31.1(f) (addressing information in "previously printed newspapers" and certain information disclosed in telephone directories or directory assistance); N.J.S.A. 47:1B-3 (recognizing an exception to requirements for redaction of public records for categories of public records including certain voting records, records of political candidates, and real estate title records).

18

To make determinations about the home addresses of covered persons in public records, Daniel's Law created an Office of Information Privacy within the Department of Community Affairs and prescribed a procedure for an authorized person to submit or revoke a request for redactions from public records.  N.J.S.A. 47:1B-1 to -2.  The covered person's home address "shall only be subject to redaction or nondisclosure if a request is submitted to and approved by the Director of the Office of Information Privacy."  Id. at -2(a); see also id. at -2(b)(1) (prescribing the procedure for a public agency's redaction or nondisclosure of the information in the event that approval is granted).  "A custodian of a public agency who makes a reasonable effort to comply with this subsection shall be presumed to have acted without willful, purposeful, or reckless disregard of the law."  Id. at -2(b)(2).

As the Legislature instructed, Daniel's Law "shall be liberally construed in order to accomplish its purpose and the public policy of this State" -- the protection of certain public officials and their immediate families from threats and harm that might impede their ability to serve the public.  N.J.S.A. 56:8-166.3.

## C.

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the

19

press." "Similarly, '[t]he New Jersey Constitution guarantees a broad affirmative right to free speech[.]'" E & J Equities, LLC v. Bd. of Adjustment of Franklin, 226 N.J. 549, 568 (2016) (alterations in original) (quoting Dublirer v. 2000 Linwood Ave. Owners, Inc., 220 N.J. 71, 78 (2014)). Our State Constitution provides that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." N.J. Const. art. I, ¶ 6.

"'Because our State Constitution's free speech clause is generally interpreted as co-extensive with the First Amendment, federal constitutional principles guide the Court's analysis.'" E & J Equities, 226 N.J. at 568 (quoting Twp. of Pennsauken v. Schad, 160 N.J. 156, 176 (1999)); see also State v. Fair, 256 N.J. 213, 231-32 (2024) (noting that although this Court often interprets the New Jersey Constitution's free speech guarantees as being coextensive with the First Amendment and allows federal constitutional principles to guide its analysis, in certain contexts it has held that the New Jersey Constitution's free speech clause provides greater protection than the First Amendment.)

As the parties agree, New Jersey's free speech and press protections, on which plaintiffs rely, are coextensive with their federal analogues with respect

20

to the freedom of speech and freedom of the press issues presented in this appeal.  See G.D. v. Kenny, 205 N.J. 275, 299-300 (2011) (applying Florida Star, 524 U.S. at 532, and Daily Mail, 443 U.S. at 98-100, to free speech claims based on the First Amendment and Article I, Paragraph 6 of the New Jersey Constitution in a defamation case).  Accordingly, United States Supreme Court case law applying First Amendment guarantees of freedom of speech and freedom of the press guides our analysis.

In a series of decisions known as the Daily Mail line of cases, the Supreme Court developed a three-part test to resolve "[t]he tension between the right which the First Amendment accords to a free press, on the one hand, and the protections which various statutes and common-law doctrines accord to personal privacy against the publication of truthful information, on the other."  Fla. Star, 491 U.S. at 530.  In each setting, the Court has recognized a First Amendment right to publish the contested information, but it "emphasized each time that we were resolving this conflict only as it arose in a discrete factual context."  Ibid.

In the first of those decisions, Cox Broadcasting Corporation v. Cohn, the Court barred on First Amendment grounds a civil judgment entered against a media company for broadcasting the name of a crime victim because the reporter had obtained the victim's name from court records.  420 U.S. 469,

487-97 (1975).  It held that "the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection," and that "[o]nce true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it."  Id. at 495-96.  The Supreme Court later concluded in Nebraska Press Ass'n v. Stuart that a court order that "prohibited the reporting of evidence adduced" at an "open preliminary hearing" in a murder prosecution "plainly violated settled principles" of First Amendment law.  427 U.S. 539, 568 (1976).  And in Oklahoma Publishing Co. v. District Court in & for Oklahoma County, the Court struck down on First Amendment grounds an Oklahoma judge's injunction barring the media from publishing the name or photograph of a child who was the subject of a juvenile proceeding attended by reporters.  430 U.S. 308, 308-09 (1977).

In Daily Mail, the Supreme Court addressed a challenge to a West Virginia statute that made it a crime to publish in a newspaper the name of any minor charged as a juvenile offender without the juvenile court's prior written approval.  443 U.S. at 98, 102-03.  The West Virginia Supreme Court of Appeals, concluding that the West Virginia statute created an unconstitutional prior restraint, issued a writ of prohibition barring an indictment under that

statute. <u>State ex rel. Daily Mail Publ'g Co. v. Smith</u>, 248 S.E.2d 269, 270-72 (W. Va. 1978).

The United States Supreme Court granted certiorari and affirmed. <u>Daily Mail</u>, 443 U.S. at 102-03. The Court observed that "[t]he resolution of this case does not turn on whether the statutory grant of authority to the juvenile judge to permit publication of the juvenile's name is, in and of itself, a prior restraint." <u>Id.</u> at 101. Instead, the Court prescribed a specific test for the setting of the case before it: "if a newspaper lawfully obtains truthful information about a matter of public significance[,] then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." <u>Id.</u> at 103.

Applying that standard, the Supreme Court found that the newspaper had "relied upon routine newspaper reporting techniques to ascertain the identity of the alleged assailant." <u>Ibid.</u> It noted that "even assuming the statute served a state interest of the highest order, it does not accomplish its stated purpose" because the juvenile's name was broadcast on the radio before the publication that gave rise to the appeal. <u>Id.</u> at 105. Stressing that its holding was "narrow," the Court found the statute to violate the First Amendment in that case. <u>Id.</u> at 105-06.

23

A decade later, in <u>Florida Star</u>, the Supreme Court reiterated and refined the constitutional standard stated in <u>Daily Mail</u>.  491 U.S. at 532-36.  There, a Florida court had awarded damages against a newspaper that had violated a state statute by publishing the name of a sexual assault victim.  <u>Id.</u> at 526-29. The reporter had obtained the victim's name from a police report that law enforcement officials made available in their pressroom.  <u>Id.</u> at 527.  As Justice White noted in his dissent, when the victim's name was published, the perpetrator of the sexual assault was still at large.  <u>Id.</u> at 542 (White, J., dissenting).  The Florida statute did not impose a reasonableness standard akin to that governing common-law invasion of privacy, but instead provided that publication constituted per se negligence.  <u>Id.</u> at 539.  A jury awarded the victim damages under the statute, the state intermediate appellate court affirmed, and the Supreme Court of Florida denied discretionary review.  <u>Id.</u> at 530.

In <u>Florida Star</u>, the Supreme Court reiterated its holding in <u>Daily Mail</u> that the conflict between free speech and privacy rights must be decided on a case-by-case basis.  <u>Id.</u> at 533.  It observed that "the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case."  <u>Ibid.</u>

24

The Court found in <u>Florida Star</u> that the <u>Daily Mail</u> standard was "supported by at least three separate considerations, in addition to, of course, the overarching '"public interest, secured by the Constitution, in the dissemination of truth."'" <u>Id.</u> at 533-34 (quoting <u>Cox</u>, 420 U.S. at 491). First, the Court noted the limited reach of <u>Daily Mail</u>, which protects only "the publication of information which a newspaper has 'lawfully obtain[ed].'" <u>Id.</u> at 534 (alteration in original) (quoting <u>Daily Mail</u>, 443 U.S. at 103). It viewed that constraint to leave the government "ample means of safeguarding significant interests upon which publication may impinge, including a rape victim's anonymity" by attempting to prevent the dissemination of such information if it is in private or government hands. <u>Ibid.</u> Second, the Supreme Court observed that "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." <u>Id.</u> at 535. Third, the Court invoked the specter of media "self-censorship," commenting that a contrary rule "depriving protection to those who rely on the government's implied representations of the lawfulness of dissemination" would impose on "the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication." <u>Id.</u> at 535-36.

25

Applying the Daily Mail standard to the case before it, the Supreme Court first found that the newspaper had lawfully obtained and accurately reported the victim's name.  Id. at 536-37.  It noted that state officials were not required to disclose police reports revealing the identities of sexual offense victims as public records but found that factor "does not make it unlawful for a newspaper to receive [such police reports] when furnished by the government."  Id. at 536.

The Supreme Court concluded "that the news article concerned 'a matter of public significance' in the sense in which the Daily Mail synthesis of prior cases used that term."  Id. at 536 (quoting Daily Mail, 443 U.S. at 103).  It explained that "the article generally, as opposed to the specific identity contained within it, involved a matter of paramount public import:  the commission, and investigation, of a violent crime which had been reported to authorities."  Id. at 536-37.[4]

_____

[4]  The Supreme Court later underscored that principle in the different setting of a First Amendment picketing case in Snyder v. Phelps, 562 U.S. 443, 452-53 (2011).  There, the Court held that

> [s]peech deals with matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."

Second, the Supreme Court characterized the interest served by the Florida statute -- preserving the privacy and protecting the safety of rape victims -- as "highly significant" but not as a "state interest of the highest order." Id. at 537; see also id. at 541-42 (Scalia, J., concurring) (construing the majority opinion to find that the Florida statute did not serve an interest of the highest order and finding that holding sufficient on its own to strike the law on First Amendment grounds).

Third, the Supreme Court did "not rule out the possibility that, in a proper case, imposing civil sanctions for publication of the name of a rape victim might be so overwhelmingly necessary to advance those interests as to satisfy the Daily Mail standard." Id. at 537.

The Court declined to reach that conclusion in the setting before it for three reasons:  (1) the manner in which the newspaper had obtained the victim's name; (2) the Florida statute's per se negligence standard; and (3) the statute's "facial underinclusiveness" which gave rise to "serious doubts about

---

[Id. at 453 (first quoting Connick v. Meyers, 461 U.S. 138, 146 (1983); and then quoting City of San Diego v. Roe, 543 U.S. 77, 83-84 (2004)).]

The Court noted in Snyder that "speech on matters of public concern . . . is at the heart of the First Amendment's protection" because "it is the essence of self-government." 562 U.S. at 451-52 (omissions in original) (internal quotations and citations omitted).

27

whether Florida is, in fact, serving, with this statute, the significant interests which appellee invokes in support of affirmance." Id. at 538-40.  On that last point, the Court stated that it could not conclude that the statute "satisfactorily accomplishes its stated purpose" because the Florida statute "prohibits the publication of identifying information only if this information appears in an 'instrument of mass communication,' a term the statute does not define." Id. at 540-41.  The Supreme Court held that "[w]ithout more careful and inclusive precautions against alternative forms of dissemination, we cannot conclude that Florida's selective ban on publication by the mass media satisfactorily accomplishes its stated purpose." Id. at 541.

Characterizing its holding as "limited," the Supreme Court stated,

> We do not hold that truthful publication is automatically constitutionally protected, or that there is no zone of personal privacy within which the State may protect the individual from intrusion by the press, or even that a State may never punish publication of the name of a victim of a sexual offense.  We hold only that where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order, and that no such interest is satisfactorily served by imposing liability under [the Florida statute] . . . under the facts of this case.
>
> [Ibid.; accord Bartnicki v. Vopper, 532 U.S. 514, 527 (2001).]

28

The Supreme Court therefore found that the damages award violated the First Amendment and reversed.  Fla. Star, 491 U.S. at 541.

### D.

We apply the principles stated by the Supreme Court in the Daily Mail line of cases to Kratovil's as-applied challenge to Daniel's Law.[5]

---

[5]  In the Daily Mail line of cases, the Supreme Court did not use the term "strict scrutiny" to describe the standard it imposed.  See, e.g., Fla. Star, 491 U.S. at 533-35; Daily Mail, 443 U.S. at 103-04.  As the Third Circuit recently observed,

> Two lines of precedent apply.  Under one, we focus on whether the Law's restriction on speech is content-based.  If it is, we apply strict scrutiny; if not, then intermediate scrutiny.  City of Austin v. Reagan Nat'l Advert. of Austin, LLC, 596 U.S. 61, 142 S. Ct. 1464, 1471-74 (2022).  Under the other, we ask instead whether the Law punishes publishing lawfully obtained, truthful information of public concern.  See Bartnicki v. Vopper, 532 U.S. 514, 526-28 (2001).  If it does, the Law is invalid unless it serves "a need to further a state interest of the highest order."  Daily Mail, 443 U.S. at 103.  We need not reconcile these two lines of precedent here because both point the same way:  under either, Schrader is likely to win.
>
> [Schrader v. Dist. Att'y of York Cnty., 74 F.4th 120, 126 (3d Cir. 2023).]

As his complaint and briefs make clear, Kratovil's as-applied challenge is premised on the standard set forth in the Daily Mail line of cases, and accordingly we decide this case based on that First Amendment standard alone.

29

1.

Our first inquiry is whether Caputo's home address is truthful information that was lawfully obtained and is of public significance.  Id. at 536.

Caputo maintains that he rented other residences near his workplace and stayed there on weekdays, as well as on weekends when his duties required, but he does not dispute that the Cape May address that Kratovil obtained from the voter profile is the correct address of his home in that municipality.  There is, accordingly, no dispute that the information at issue is truthful.

We concur with the trial court's finding that Kratovil lawfully obtained Caputo's home address from the records custodian of the Cape May Board of Elections in response to an OPRA request.  Although defendants contend that Kratovil misadvised the Cape May Board of Elections records custodian about the legal standard governing production of Caputo's address, there is no indication in the record that Kratovil violated any law in his communications with the custodian.

We do not conclude that because Kratovil was permitted to write a story identifying Cape May as the municipality where Caputo lived without including his precise home address, this case does not involve a matter of public concern.  In Florida Star, the Court did not frame the question to be

30

whether the crime victim's name was itself a matter of public concern, but

whether the subject of the news article was a matter of public concern.  491

U.S. at 537.  It found that the subject of the article -- violent crime investigated

by law enforcement -- was a matter of public concern.  Ibid.[6]  And in

Ostergren v. Cuccinelli, the Fourth Circuit held that Virginia electronic land

records containing homeowners' Social Security numbers, published by an

information privacy advocate to expose Virginia's online disclosure of

residents' personal information, "plainly concern[ed] 'a matter of public

significance,' because displaying the contents of public records and criticizing

Virginia's release of private information convey political messages that

concern the public."  615 F.3d 263, 276 (4th Cir. 2010) (quoting Daily Mail,

443 U.S. at 103).

In the specific setting of this appeal, the contested information --

Caputo's exact home address in Cape May -- is related to Kratovil's proposed

story suggesting that Caputo lived too far from New Brunswick to effectively

---

[6]  In two decisions, the Fifth Circuit has cautioned that judicial parsing of the
details of media reports about issues of public concern may raise First
Amendment concerns.  Lowe v. Hearst Commc'ns, Inc., 487 F.3d 246, 251
(5th Cir. 2007) (noting that it had "declined to get involved in deciding the
newsworthiness of specific details in a newsworthy story where the details
were 'substantially related' to the story." (quoting Cinel v. Connick, 15 F.3d
1338, 1346 (5th Cir. 1994))); Ross v. Midwest Commc'ns, Inc., 870 F.2d 271,
275 (5th Cir. 1989) ("Exuberant judicial blue-pencilling after-the-fact would
blunt the quills of even the most honorable journalists.").

discharge his public duties.  The subject matter of the story -- a public

official's alleged failure to perform his duties because he lived hours from the

community he served -- is clearly a matter of public concern.  We therefore

hold, in the specific circumstances of this case, that Caputo's home address in

Cape May relates to a matter of public concern, and modify the Appellate

Division's decision with respect to that issue.[7]

2.

The second inquiry in the test prescribed in Daily Mail and Florida Star

is whether the challenged law "serves 'a need to further a state interest of the

highest order.'"  Fla. Star, 491 U.S. at 537 (quoting Daily Mail, 443 U.S. at

103).  In this appeal, all parties agree that Daniel's Law serves a state interest

of the highest order.  The trial court and Appellate Division found that

Daniel's Law serves a state interest of the highest order.  We agree.

The United States Supreme Court did not define a "state interest of the

highest order" in Daily Mail or Florida Star.  In Ostergren, however, the

Fourth Circuit recognized the harm that may result from public disclosure of

Social Security numbers.  615 F.3d at 280.  It stated that "[g]iven the serious

---

[7] In Atlas Data Privacy Corp. v. We Inform, LLC, which arose in
circumstances distinct from the setting of this appeal, the District Court found
that the home addresses and unpublished home telephone numbers of
thousands of police and correctional officers "are not matters of public
significance."  758 F. Supp. 3d 322, 337 (D.N.J. 2024) (appeal filed).

privacy concerns and potential harm stemming from [Social Security number] dissemination, Virginia's asserted interest in protecting individual privacy by limiting [Social Security numbers'] public disclosure may certainly constitute 'a state interest of the highest order.'" Id. at 280 (quoting Daily Mail, 443 U.S. at 103). The Fourth Circuit concluded that it "need not ultimately decide that question," because it resolved the constitutional challenge before it on other grounds. Id. at 280.

Here, as the Legislature expressly provided, it enacted Daniel's Law "to enhance the safety and security of certain public officials in the justice system, including judicial officers, law enforcement officers, child protective investigators in the Division of Child Protection and Permanency, and prosecutors, who serve or have served the people of New Jersey," and their immediate family members, "to foster the ability of these public servants who perform critical roles in the justice system to carry out their official duties without fear of personal reprisal from affected individuals related to the performance of their public functions." N.J.S.A. 56:8-166.3. In a federal challenge to Daniel's Law, the United States District Court for the District of New Jersey noted "the well-known fact, amply documented by the record [in that case], that in recent years judges, prosecutors, police, correctional officers, and others in law enforcement have been the subject of an ever increasing

33

number of threats and even assassinations," some of which "have been facilitated by malefactors obtaining the home address or unlisted phone number of their targets." Atlas Data Priv. Corp. v. We Inform, 758 F. Supp. 3d 322, 337 (D.N.J. 2024).  And the Attorney General's amicus submission here cited numerous sources, including a statistical report by the U.S. Marshals Service and news coverage of the recent killing of a New Jersey police officer, that underscore the persistence and severity of the problem the Legislature enacted Daniel's Law to address.  New Jersey's interest in protecting public officials from such threats and thus ensuring that they may carry out their duties without fear of harm to themselves or their families is clearly a state interest of the highest order under Daily Mail and Florida Star.

3.

Finally, we determine whether Daniel's Law, as applied to Kratovil, is narrowly tailored to promote the state interest it was enacted to serve.  "To narrowly tailor, the state must choose 'the least restrictive means among available, effective alternatives.'" Schrader, 74 F.4th at 127 (quoting Ashcroft v. ACLU, 542 U.S. 656, 666 (2004)).  In the specific circumstances of this case, we hold that when it enacted Daniel's Law, the Legislature carefully calibrated the statute to serve a state interest of the highest order by the least restrictive means.

34

First, the statute does not purport to protect all public employees. Instead, it is expressly limited to discrete categories of current and former public officials viewed by the Legislature to be at particular risk: judges, law enforcement officers, child protective investigators in the Division of Child Protection and Permanency, and prosecutors. See N.J.S.A. 56:8-166.1, -166.3; N.J.S.A. 2C:20-31.1.

Second, Daniel's Law implicates only two categories of information: the covered person's home address and the covered person's unpublished home telephone number. N.J.S.A. 56:8-166.1(a)(1); N.J.S.A. 2C:20-31.1. The statute's specificity eliminates "the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication." Fla. Star, 491 U.S. at 536. If a person or entity receives notice in accordance with Daniel's Law, that person or entity is aware of the precise information that must be withheld from disclosure. See N.J.S.A. 56:8-166.1(a)(1) to (2); N.J.S.A. 2C:20-31.1(b) to (c).

Third, even if an individual falls within one of the discrete categories of "covered persons," the statute imposes no liability for publishing that individual's address or phone number unless and until an authorized person expressly invokes the protection of Daniel's Law by providing the notice required by N.J.S.A. 56:8-166.1(a)(1) to (2) and N.J.S.A. 2C:20-31.1(b) to (c).

That strict notice requirement ensures that the statute is not a trap for the unwary; to the contrary, following receipt of the statutory notice, the recipient has an opportunity to identify the specific information subject to restrictions on disclosure and take steps to maintain the confidentiality of that information. Ibid. Daniel's Law substantially differs from the Florida statute struck down in Florida Star, which authorized civil damages against the newspaper with no notice or opportunity to prevent a disclosure or redisclosure of the victim's name. See 491 U.S. at 527-29.

Fourth, Daniel's Law is not underinclusive and thus inadequate to serve the state interest, as were the statutes struck down by the United States Supreme Court in Daily Mail and Florida Star. See Fla. Star, 491 U.S. at 540 (noting that the statute at issue prohibited publication of the protected information only in an "instrument of mass communication," thus failing to achieve the state's goal of protecting crime victims, and holding that any prohibition on publishing truthful information must be applied "evenhandedly, to the smalltime disseminator as well as the media giant"); Daily Mail, 443 U.S. at 104-05 (stating that the disputed statute failed to serve its purpose because it restricted only "newspapers," not electronic media or other forms of publication, from identifying young people charged in juvenile proceedings).

36

Indeed, Daniel's Law is not focused on media in general, let alone a particular category of media; N.J.S.A. 56:8-166.1(a) and (b) apply to "a person, business, or association," and N.J.S.A. 2C:20-31.1(b) applies to "a person." Consistent with the Legislature's intent to protect covered persons from disclosures that may harm them, "[a]ll non-governmental entities are treated the same." Atlas Data, 758 F. Supp. 3d at 338.

Kratovil proposes three amendments to Daniel's Law that would, in his view, achieve narrow tailoring and render the statute constitutional, and without which the statute must be struck down: (1) a provision for government "self-policing" in the form of the training and auditing of records custodians so that they do not improperly disclose information protected by Daniel's Law and the imposition of liability on custodians for negligent disclosure; (2) the adoption of an exception found in the federal analogue to Daniel's Law, Pub. L. No. 117-263 § 5934(d) (2022), for disclosures "relevant to and displayed as part of a news story, commentary, editorial or other speech on a matter of public concern"; and (3) the elimination of the statute's criminal sanctions in favor of civil penalties such as fines.

We do not share Kratovil's view that these measures are necessary to narrowly tailor Daniel's Law to achieve the state interest of the highest order that it was enacted to serve.

37

First, there is no evidence that records custodians in our State are untrained or unsupervised, or that the apparent error that occurred here -- the custodian's disclosure of the unredacted voter profile after receiving Kratovil's e-mail -- would have been prevented by further training, heightened oversight, or the threat of liability.  Grafting on Daniel's Law a provision mandating training, supervision, and liability for records custodians would not constitute narrow tailoring of the statute to achieve its purpose.

Second, when it enacted Daniel's Law, the Legislature could have carved out an exception for media and other communications on matters of public concern, as Congress did in enacting the statute's federal analogue. Compare N.J.S.A. 56:8-166.1, with Pub. L. No. 117-263 § 5934(d).  The Legislature, however, has determined that disclosures of covered persons' home addresses and unpublished telephone numbers by any "person, business, or association"  -- whether or not that person or entity constitutes "media" -- pose risks to the safety and privacy of law enforcement and other covered persons serving this State.  See N.J.S.A. 56:8-166.1(a) to (b); N.J.S.A. 2C:20-31.1(b), (d).  We do not view the significant alteration that Kratovil advocates to provide an "effective alternative[]" to the statute as enacted.  See Ashcroft, 542 U.S. at 666.

38

Finally, we address Kratovil's contention that Daniel's Law should impose only civil penalties, not criminal liability.  Given the grave threats to public officials, tragically illustrated by the murder of the young man for whom Daniel's Law is named, it was the Legislature's judgment to deter reckless and intentional disclosures of a discrete category of information by prescribing criminal penalties for such disclosures.  See N.J.S.A. 2C:20-31.1(b), (d).  Criminal sanctions may not be imposed absent a finding that the person disclosed the information recklessly or intentionally.  Ibid.  If its criminal provision were eliminated, Daniel's Law would less effectively serve the state interest of the highest order it was enacted to achieve.  We decline to compel such a fundamental change.

In sum, as applied to Kratovil, Daniel's Law as written is narrowly tailored to achieve the state interest of the highest order:  protection of certain public officials from harm and the threat of harm so that they can perform their public duties without fear of reprisal.  N.J.S.A. 56:8-166.3.

Because Daniel's Law complies with the First Amendment principles of Florida Star and Daily Mail, it also conforms to the freedom of speech and press guarantees, set forth in Article I, Paragraph 6 of the New Jersey Constitution, that Kratovil invokes in this appeal.  Given our conclusion that Kratovil's constitutional claim fails, we also determine that he is not entitled to

39

relief under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2.  See <u>Harz v. Borough of Spring Lake</u>, 234 N.J. 317, 330 n.4 (2018) (stating that the New Jersey "Civil Rights Act protects only against the deprivation of 'substantive rights, privileges or immunities secured by the Constitution or laws of this State'" (quoting N.J.S.A. 10:6-2(c))).

In light of these dispositive conclusions, we do not reach other arguments presented by amici in this as-applied case.

We hold that the trial court properly dismissed Kratovil's complaint, and the Appellate Division properly affirmed the trial court's judgment.

## IV.

The judgment of the Appellate Division is affirmed as modified.


JUSTICES PIERRE-LOUIS, WAINER APTER, and NORIEGA, and JUDGE SABATINO (temporarily assigned) join in JUSTICE PATTERSON's opinion.  CHIEF JUSTICE RABNER and JUSTICES FASCIALE and HOFFMAN did not participate.